## STATE v. KAUFMANN.

Under Rev. Code Cr. Proc. § 430, subd. 4, authorizing a new trial where a verdict has been reached through means other than a fair expression of opinion of the jurors, prejudicial misconduct of counsel for the state is reviewable on appeal from an order denying new trial.

Where the address of a prosecuting attorney abounded in misstatements as to the law and the evidence, and was replete with appeals to passion and prejudice, and showed an intentional disregard of the decisions of the Supreme Court by allusions through artful indirection to the fact that the accused had not testified in her own behalf, and numerous manifestly incompetent questions were asked for the evident purpose of influencing the jury, many of which were subsequently withdrawn, and where an examination of the record shows that the special counsel was totally ignorant of the rules governing the conduct of a public prosecutor or intentionally violated them almost continuously during the progress of the trial, it is ground for reversal.

Generally the conduct of a trial and the line of argument counsel are permitted to pursue rest largely in the trial court's discretion, as does the granting or refusing of a new trial for irregularities or misconduct of parties or attorneys, and a decision denying a new trial will only be disturbed for abuse of such discretion.

In a murder trial it was proper to admit testimony as to wounds other than those described in the information, as bearing on the cause of decedent's death.

In a murder trial the character of clothing worn by decedent when taken to the hospital before her death was immaterial.

In defining reasonable doubt for the jury in a murder trial, the judge's statement, "But this charity and this presumption ought not to be perverted, as they not infrequently are, to justify the acquittal of those of whose guilt no reasonable doubt exists," was improper as tending to induce belief that the reasonable doubt doctrine is one of questionable propriety, which might better be ignored than respected.

(Opinion filed, Nov. 18, 1908.)

Appeal from Circuit Court, Moody County.     Hon. E. G. SMITH, Judge.

Emma Kaufmann was convicted of manslaughter, and she ap-

I. 23 S. D 28

peals from an order denying a new trial. Reversed, and new trial ordered.

*Aikens & Judge, Rice & Benson,* and *Jordan & Warren,* for appellant.

Language which might be permitted to counsel in summing up in a civil case cannot with propriety be used by a public prosecutor, who is a quasi judicial officer, representing the People of the State and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim and asks no conviction through the aid of passion, sympathy or resentment. People v. Fielding, 152 N. Y. 547; Lindsay v. Pettigrew, 3 S. D. 199; Ansland v. Parker, 14 S. D 273; People v. Greenwall, 115 N. Y. 520; People v. Devine, 30 Pac. 378; People v. Lee Chuck, 20 Pac. 719; People v. Wells, 34 Pac. 1078; Atherton v. DeFreeze, 88 N. W. 886; Graves v. U. S. 150 U. S. 118; State v. Moxley, 14 S. W. 969. The character of clothing worn by decedent when taken to a hospital before her death was immaterial. 1 Jones Ev., § 137; Xenia Bank v. Stewart, 114 U. S. 224; U. S. v. Ross, 92 Id. 281; Durkee v. Indiana Ins. Co., 159 Mass. 154; Kirkland v. State, 30 So. Rep. 352; Green v. State, 12 Tex. Cr. App. 219; Christian v. State, 79 S. W. 562; Cole v. State, 75 Id| 527; Patton v. State, 43 S. E. 533; Laidlaw v. Sage, 156 N. Y. 103-4. Evidence as to other wounds, sores or bruises, than those described in the information, or to permit counsel in opening to refer to them, were irrevelant and prejudicial. Globe Acc. Ins. Co. v. Gerisch, 163 Ill. 635; Binns v. State, 66 Ind. 428; U. S. v. Ross, 92 U. S. 281; Manning v. John Hancock Ins. Co., 100 Id. 693; State v. Rome, 64 Conn. 329; Best on Evidence, 95; Starkie on Evidence, 17 and 80; Ruppert v. Brooklyn Heights R. R. Co., 154 N. Y. 94; People v. Harris, 136 Id. 429. It was error for the counsel for state to directly or indirectly call the jury's attention, that the defendant had not testified. State v. Williams, 11 S. D. 64; State v. Garrington, Id. 187; State v. Bennett, 21 S. D. 396, 113 N. W. 78; State v. Jones, Id. 716;

State v. Trauger, 71 N. W. 337. In defining reasonable doubt for the jury in a murder trial, the judge's statement "but this charity and this presumption ought not to be perverted, as they not infrequently are, to justify the acquittal of those of whose guilt no reasonable doubt exists" was improper as tending to induce belief that the reasonable doubt doctrine is one of questionable propriety which might better be ignored than respected. It is improper in declaring the correct test, to refer to it as the "humane provision of the law." From such a characterization the jury are very apt to conclude that the case before them is one which calls for the application of the principle. Dennis v. State, 112 Ala. 64; Oakley v. State, 135 Id. 69; Shepperd v. State, 94 Id. 102.

*S. W. Clark, Atty. Gen., Alpha F. Orr, State's Atty., and Thos. H. Null,* for the State.

Generally where a dead body is found with an injury to it apparently sufficient to cause death, under circumstances which exclude an inference of suicide or accident, death by criminal agency is established. People v. Palmer, 109 N. Y. 113; People v. Wood, 79 Pac. 367; Ruel v. State, 30 N. W. 78; State v. Williams, 78 Am. Dec. 248. If the intemperate remarks of the prosecuting attorney in criminal cases, made in the heat and excitement of the trial, and sometimes under provocation of language used by counsel for the defendant, may always be the foundation for a new trial, the administration of criminal justice will become very uncertain. The trial court has the power in its discretion to order a new trial if defendant has been prejudiced by such language. Here the trial judge who heard all that was said and done on the trial refused to grant a new trial, its action must be deemed conclusive. Burdick v. Haggart, 4 Dak. 13; Grant v. Grant, 6 S. D. 150; People v. Greenwall, 115 N. Y. 520; State v. Seely, 92 Ia. 488; State v. Landers, 21 S. D. 612; Epps v. State, 102 Ind. 539; Anderson v. State, 104 Ind. 467; McLain v. State, 18 Neb. 154; State v. Pancoast, 35 L. R. A. 533.

HANEY, P. J. This appeal is from an order denying defendant's application for a new trial. Accused of murder she was found guilty of manslaughter in the first degree; the charge being

that she caused the death of Agnes Polreis by inflicting three mortal wounds upon the head and two mortal wounds upon the shoulders with a dangerous and deadly instrument to the informant unknown. The evidence disclosed that the deceased, then aged about 16 years, entered defendant's home as a servant in February, 1906, and that she was removed therefrom to a hospital on the morning of June 1, 1906, where she died a few hours later. There was testimony, if believed, which strongly tended to prove ill treatment of the deceased or inexcusable neglect by the defendant. There were circumstances attending the girl's death naturally calculated to excite suspicion and create intense prejudice against the accused. It appears from the record that preceding and during the trial certain newspapers having more or less extended circulation in the county where the crime is alleged to have been committed, and the one in which the action was tried, gave unusual publicity to every fact, incident, and rumor connected with the unfortunate affair in such a manner as to greatly intensify the existing prejudice. Special counsel was employed to assist the state's attorney, who assumed entire control of the prosecution; expensive medical experts from other states were employed to support the theory of the government; large and demonstrative crowds daily attended the trial; and, as is usual in so-called "celebrated cases," every one connected with the proceedings appears to have become more or less fatally imbued with the notion that he was the principal participant in the most important event in the history of criminal jurisprudence. It requires no argument to demonstrate that such conditions are not peculiarly conducive to the exercise of that impartial and discriminating judgment which should characterize the deliberations and decisions of courts and juries, especially when the life and liberty of a presumptively innocent person are involved. As heretofore suggested, there was evidence which, if believed, would necessarily subject defendant's conduct towards the deceased to the most severe condemnation, and which was, if believed, sufficient to convict her of culpable negligence; but that charge was not embraced by the pleadings. As stated by the learned circuit judge in his instructions to the jury: "The state charges the defendant with the murder of Agnes Polreis, by acts of violence and

by means of blows and wounds, described and set out in the information, and the charge against the accused, therefor, is not unlawful homicide committed through criminal negligence in willfully failing or refusing or neglecting to provide for the deceased proper medical aid or nursing, and this proposition is true, no matter what facts may be disclosed by the evidence in this case with relation to her conduct toward the deceased in that respect, if you shall believe that the evidence does disclose such facts. * * * The court further instructs you as the law of this case, that if you believe the defendant did strike and wound the deceased, Agnes Polreis, giving her the wounds, charged in the information, and if you further believe that at the time of said striking the deceased was, and for a time prior thereto had been, suffering from disease or injuries, and was even then mortally ill, yet if the jury believe the death of the deceased was hastened by the blows struck by the defendant and charged in the information, the fact that the deceased was suffering at the time from blows or injuries other than those set out in the information, and that such disease or injury would probably have been fatal, such fact would not extenuate defendant's guilt; if the deceased yet retained any spark of vitality, and the act of the defendant, by means of the specific wounds charged in the information, cut short the existence of the deceased, the defendant would be responsible for such death to the same extent as if the deceased had been at the time in full health and vigor. But while this is clearly the law, the jury should exercise its keenest intelligence in applying this rule of law to the particular facts in this case, and in this connection the jury are further instructed upon the ultimate question what was the cause of the death of the deceased, in order to convict the defendant under this information, you must be able to trace the death, beyond a reasonable doubt, to the specific injuries alleged in the information and proved beyond a reasonable doubt to have been inflicted by the defendant." The nature of the wounds afforded slight, if any, foundation for a satisfactory opinion as to what caused them; all the evidence, if any, tending to connect the defendant with the alleged crime was circumstantial; but there was uncontradicted testimony to the effect that a poor servant girl had received unkind treatment during the

days directly preceding her death.  It was, indeed, a case requiring
the exercise of the keenest intelligence on the part of the jury,
judge and counsel; a case where prejudice against the defendant's
conduct, if not against herself, was unavoidable; where, inde-
pendently of rules of procedure, it appeared that the accused merit-
ed condemnation and punishment.  It was a case requiring excep-
tional care to exclude from the consideration of the jury everything
calculated to influence its decision which was not relevant to the
issues presented by the information and plea of not guilty; a case
wherein an understanding of the real issues, the popular prejudice,
and the situation of the accused is essential to a proper considera-
tion of her assignments of error on this appeal.

The first ground of defendant's motion for a new trial is in
effect that she was prevented from having a fair and impartial trial
by reason of the misconduct of counsel for the state.    In
support of this ground numerous instances of alleged mis-
conduct on the part of the special prosecutor are speci-
fied in the assignments of error.    If there were any irreg-
larities in this respect which were prejudicial to the substantial
rights of the defendant, they are reviewable on this appeal.  Rev.
Code Cr. Proc. § 430, subd. 4;  State v. Place, 20 S. D. 489, 107
N. W. 829.  The decisions wherein misconduct of counsel has been
considered are numerous.  It is believed that all rest upon substan-
tially the same fundamental principles, though different language
may be employed in the application of such principles to the pe-
culiar facts of each particular case.  In all these cases the ulti-
mate and controlling questions are whether the verdict is or must
be presumed to be a fair expression of the opinion of the jurors
upon the issues submitted by the court, and whether such opinion
was based alone upon the evidence received on the trial.  Concern-
ing the conduct of counsel in civil cases this court has said: "With-
in the limits of the testimony, the right of argument, criticism, and
comment is free; but when counsel makes assertions calculated to
prejudice the minds of the jury, not warranted by the testimony
before them, he goes beyond the freedom of discussion the law and
the courts allow him.  The only matters proper to be considered
by the jury are the issues raised by the pleadings and the evidence

admitted by the court. * * * Counsel, as officers of the court, should never, in their zeal for their clients, so far forget the duty they owe to the court as to improperly attempt to prejudice or influence the jury in the discharge of their duties, by bringing before them in argument matters not in evidence in the case; and it is the duty of trial courts to see that no such improper statements are permitted to be made to the jury." Lindsay v. Pettigrew, 3 S. D. 199, 52 N. W. 873. Concerning the same subject in a criminal action the New York Court of Appeals thus forcefully declares the rule which should prevail in the trial of all criminal actions: "Language which might be permitted to counsel in summing up a civil action cannot with propriety be used by a public prosecutor, who is a quasi judicial officer, representing the people of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy, or resentment." People v. Fielding, 158 N. Y. 542, 53 N. E. 497, 46 L. R. A. 641. Presumptively the best thought of the profession, in this country, on the subject of the lawyer's duties, has found expression in the canons of ethics proposed by the American Bar Association, from which we quote the following excerpts: "A lawyer should not offer evidence which he knows the court should reject, in order to get the same before the jury by argument for its admissibility, nor should he address to the judge arguments upon any point not properly calling for determination by him. Neither should he introduce into an argument, suitably addressed to the court, remarks or statements intended to influence the jury or bystanders. These and all kindred practices, appropriately termed 'pettifoggery,' are unprofessional and unworthy of an officer of the law charged, as is the lawyer, with the duty of aiding in the administration of justice." 67 Cent. Law. J. 46.

Mindful of these recognized standards, we proceed to consider some of the many instances of alleged misconduct disclosed by the record in this case. The opening statement to the jury on the part

of the government, which should have been a calm and dispassionate outline of the facts relied upon in good faith to establish the crime charged, is thus described in an uncontradicted affidavit read in support of the motion for a new trial: "Amid the deathlike silence that followed, Lawyer Egan arose to read the complaint of the state against Mrs. Emma Kaufmann and to read his opening address. As he began reading it was apparent that the Parkston people who had retained him knew why they had asked him to act as their advocate in this important case. Every word of his indictment came full, crisp, and clear from the lips of this orator. The spectators and all in the courtroom hung on the words and the manner of their deliverance. It was impressive—an eloquent statement made out of the regular stereotyped form of indictments. * * * During this powerful arraignment by Counselor Egan, in which he repeatedly pointed his finger toward the defendant, as he portrayed in most vivid language the awful circumstances, acts, and conditions with which the state expects to surround her and finally send her to the gallows or the penitentiary, Mrs. Kaufmann writhed in her chair. She worked nervously forward to its very edge, then she would push herself back. She sat bolt upright, leaning a bit forward, now with one elbow leaning on the table, taking in every word. * * * Those who were anticipating something dramatic in the opening address were destined to have their expectations realized in a most surprising manner. * * * It was so dramatic in its presentation that the senior counsel for the defense interrupted the speaker several times to protest against the manner in which the arraignment was being made, but each time the court overruled the objection and Mr. Egan was allowed to proceed. * * * When these statements reached acts and conditions not specified in the complaint, the senior counsel for the defendant objected. He contended that Mr. Egan was speaking solely for effect on the jury, that he was summing up, making an argument. 'You will know when I am making my argument,' retorted Mr. Egan as the court allowed him to proceed. Senior counsel for the defendant did not like the broad impressionist style of the attorney from Iowa. For there came further objections from defendant's counsel. Mr. Egan's manner bothered him. The prosecutor had repeatedly

pointed his finger directly toward the face of Mrs. Kaufmann. Judge Smith, after reminding the defendant's counsel that he could not remould Mr. Egan's mannerisms, allowed the state's advocate to proceed." Regarding the opening statement the record contains the following: "We will show you that this defendant, when she knew that this girl had died, walked from room to room in her palatial home in Sioux Falls, wringing her hands—(the defendant objects to the use of adjectives such as 'palatial' home. Objection sustained. The state's counsel states it is withdrawn. It was a slip.) Walked from one room to the other in her home in Sioux Falls, wringing her hands, saying, 'What will I do; what will I do?' She was in the home of a neighbor friend, wringing her hands after the girl died, saying, 'What will I do, what will become of me?'" The defendant's home was in no sense a "palatial" one, and if it had been the fact was wholly immaterial. Persons who dwell in palaces should be protected by the presumption of innocence and all other rules of evidence to the same extent as those who live in hovels. The statement that defendant "was in the house of a neighbor friend wringing her hands," etc., was not supported by any evidence subsequently introduced. George Bressler, on behalf of the state, testified as follows: "I reside at Sioux Falls; I work for the Sioux Falls Bottling Works that is connected with the Sioux Falls Brewery. Q. The Sioux Falls Bewery? Is that the brewery in which the defendant here is represented through her counsel, as being interested?" (The defendant objects to the question in regard to the defendant being interested in the brewery because there is no evidence of that fact.) A. Yes sir. (The question was withdrawn after witness had answered it.)" It nowhere appears that the defendant was interested in any brewery, though her husband may have been at one time. Peter Erickson, an employe in the Kaufmann home, was the principal witness on behalf of the state. A voluntary statement by this witness implying that counsel for defendant had attempted to improperly influence his testimony produced a "demonstration" characterized in an uncontradicted affidavit, read in support of the motion for a new trial, as one "perhaps unequalled in any courtroom of the United States in a murder

trial. * * * The great crowd that filled every inch of sitting and standing room broke out into applause." It further appears from the same affidavit that "hisses rang through the courtroom when Erickson testified to his finding in a pool of water Agnes Polreis on the floor of the Kaufmann kitchen." After these two occurrences the following proceedings took place during the redirect examination of Erickson, as shown by the bill of exceptions: "Q. You may state further if you did not have a talk with Attorney Orr, representing the state, and Mr. Quinn, after the preliminary hearing or at about that time, in which you intimated these other things about which you have testified today? (This is objected to as incompetent.) Mr. Egan: I think the objection is good, and I withdraw the question. Since they don't want all of it, I withdraw the part. I thought maybe they wanted the whole story. (The defendant excepts to all these remarks.) Judge Aikens: I don't want to get into a jangle with counsel. Mr. Egan: You can't jangle with me. I won't do it. Mr. Aikens: The defendant excepts to the remarks made in the presence of the jury by the public prosecutor. They cannot have any other object excepting to influence, in some illegitimate way, the jury, or to bring about the applause of people who ought never to be permitted to sit in a courtroom upon such an occasion as this unless they can behave themselves. That is all I have to say. I have not lost my temper, but this is peculiarly a case where there ought not to be a resort to levity, and we except to any and all of it. Mr. Egan: I rise at this time, not to say anything in defense of myself, nor anything in defense of any imputation that counsel for defense has sought to cast upon me. Those I disregard, those I consider not, but I do stand here to protest and to insist that that protest go upon record, of any imputation that he shall make against the good people of this city, who came here, as they have a perfect right to come, into this courtroom." It is undisputed that as the special prosecutor "sat down" after this remarkable effort to preserve the dignity of the court and promote the orderly administration of justice, "the people in the courtroom gave a roar of applause which lasted several minutes and only ceased after stern rapping by the court." According to the bill of exceptions this unseemly

exhibition served only to call forth the following remarks by the learned circuit judge which in effect sustained the position of the special prosecutor and implied that the citizens appearing in the courtroom had so far not indulged in any improper conduct: "The audience must not indulge in any demonstration of that sort. I must say that I have not the slightest objection to citizens appearing here and listening to proceedings in this case; they have a perfect legal right to do so; but in doing that they must not do any act or indulge in any conduct which in any way interferes with the proper procedure of the court and should they do that it would be my duty to require the officers here to clear this room of auditors. I trust you will bear that in mind and render it unnecessary to allude to the subject again during the trial of this case. Proceed gentlemen." Dr. Germain, a witness on behalf of the defendant, having stated on cross-examination that he had been defendant's family physician for about 25 years and that he had been called to see another girl at the Kaufmann home about two years before he was called to see the deceased, the cross-examination was continued thus: "Q. Let me refresh your recollection. Do you remember that about six or seven years ago you were called there and put up a notice on the door of a certain disease of the hired girl? (This is objected to as not proper cross-examination. Mr. Egan: It bears on his interest in the defendant. By the Court: I don't know, of course, what it is you seek to reach. Mr. Egan: Well, I think the doctor does. (The objection is sustained.)" Dr. Rider, a witness on behalf of the defendant, having stated on cross-examination that he could not answer a certain question by "Yes" or "No," that he would have to qualify his answer, this followed: "Q. How do you want to qualify it? Tell the jury how you want to qualify that. Do you want to put another disease in or say you don't know? A. If you wish me to I will do so. Q. If you say you can or can't, or don't know, that will answer it. Very well; the witness has answered he can't answer it." On the cross-examination of Mr. Kirby, who, it appears, was employed as special prosecutor before Mr. Egan secured the position, and who was called by defendant to testify concerning certain conversations with the witness Erickson, the following pro-

ceedings took place: "A. I am secretary of the Western Surety Company. Q. Oh, the Western Surety Company? Is it true that they are on the bond of a good many saloon keepers of South Dakota? (Objected to as incompetent, irrelevant and not proper cross-examination.) Q. Isn't your company of which you are secretary surety on the bond of several institutions in which the defendant has a direct interest, if you know? (Objected to as not proper cross-examination, and there is no proof here Mrs. Kaufmann is in the saloon business.) Q. I will say the defendant's husband? (The question is withdrawn.)" While the state was offering evidence in rebuttal, these proceedings took place in the presence and hearing of the jury, as shown by the bill of exceptions: "Mr. Egan: Is the sheriff here? Please come foward. (The deputy sheriff steps forward. No oath having been administered, he is examined by Mr. Egan as follows): Q. Have you Dr. Landmann of Milwaukee? A. I have not heard from Mr. Hoskins. (Note.—Hoskins was the sheriff.) Q. He has not returned? A. No, sir. Judge Aikens: Q. Was the witness sworn? A. No, sir. (The defendant objects to the remarks before the jury in regard to Dr. Landmann as improper and evidently made for the purpose of prejudicially influencing the jury.) Mr. Egan: Q. Do you know what time Mr. Hoskins will get here? A. I expect him at noon on the two o'clock train, but I have not heard a word from him. (The defendant further objects to this proceeding as improper and prejudicial to the defendant.)" No ruling of the court. A few moments later this occurred: "Mr. Egan: If we had the witness Dr. Landmann or the report of the sheriff I would be able to go ahead. I started him in time and have no word from him. By the Court: I do not think I should want to delay the case any further on account of the uncertainty. Mr. Egan: The state has not asked for any delays. Mr. Egan inquires of the deputy sheriff, 'Are you sure no word has come from the sheriff?' and the deputy answers, 'I asked his wife this morning and she said she had not heard anything.' (The defendant objects to the remarks made in the presence of the jury in regard to Dr. Landmann as prejudicial.)" No ruling by the court.

Exceptions were preserved to 59 different portions of the special prosecutor's closing address to the jury. Among the statements excepted to are the following: "But there is one thing that took place in this courtroom, and there was one thing said by the counsel for the defense, that I would be a coward if I failed to resent, and to resent emphatically, and gentlemen of the jury, when it becomes my duty to do anything I am the man to do it. Judge Aikens stated in your presence on yesterday that the answer made by Peter Erickson was a trick concocted and put up by the state, and he did not stop at that. If he had I would never have referred to it, but he stated to you that the trick, concocted by a humble member of the profession which he graces, was participated in and understood by the good women and men of Flandreau. He told you in words that the applause that came, as it must come, voluntarily, from the heart of pure women and honest men always in the presence of a great wrong, was concocted and entered into by your wives and daughters and your neighbors. That is the record of this case, gentlemen. I would not have referred to this if it was not for the good women and the good men, in whose faces and in whose hearts I do not find it to say that they would pour scalding water on an unfortunate girl. * * * Gentlemen of the jury, they have never sought anywhere in this case to do anything but to get one or two men to say that they have had a reasonable doubt, to hang this jury. He told you that he has worked a year. Has he, great man that he is? What defense has he offered for his client? What defense has he offered? Who has offered any testimony here? Judge Aikens himself alone. * * * Agnes was in that home. The testimony shows that the doors are locked, and it is undisputed that she is in that home, she is in the home and the doors were locked, and under the testimony of this case, and nobody anywhere has ever disputed it. * * * Dr. Germain said that at 6 o'clock on Friday morning, the morning that the girl died—ah, that long, sad day of death—he went there. He says: 'I did not do a thing. I did not prescribe. I did not take her to the hospital. I did not give her anything.' (The defendant excepts to the remark of counsel that Dr. Germain said he did not prescribe, that he did not suggest she go to the hospital, because

the undisputed proof is that he did prescribe and that he did tell Mrs. Kaufmann to get her ready to go to the hospital.)    Mr. Egan: The jury will know.    Judge Aikens: I must except to that.    Mr. Egan: I know it hurts. * * * If this woman called up that hospital to inquire about this dying girl, why didn't you show it? It would have been competent. * * * As far as the record in this case is concerned, under her theory and the theory of this defense, that girl was kept there in the house, under their theory and the theory of this defense, that girl was kept there in the house, under their theory, and permitted to rot and die.    Under the theory of the state she was kept there and gradually mutilated and finally killed. Now, which was the right theory? Watch this testimony, for you are bound by it under your oaths.    No word.    No doctor.    No neighbor.    No neighbor called in. * * * And they say, why did she send that girl away from that home?    She didn't until she was dying, and she knew if that girl had died there that even Judge Aikens and all the money they say they have got—I have not said anything about—all the money they have got could not save her anywhere, no place, no time, if Agnes had died there in that home under the evidence there is here. * * * Gentlemen, they have criticised Erickson.    I have no word of praise for Erickson.    He will tell you in his heart, if he spoke to you, that I have said with tears in my eyes to him, 'Erickson, Erickson.' * * * I would move the bitter cup from the lips of this defendant if I could, but she did the crime.    Under the evidence it says to my mind she is guilty, and being guilty nothing shall save her because the law shall be enforced. * * * On Saturday evening, while he is gone with this man Germain, he leaves her, not as they say, in her palatial home, but they leave her in the neighbor's.    I do not say it is palatial. I submit the records they offer and ask you to say what it is.    It makes no difference, gentlemen, it hasn't anything to do with the case, but it is their own evidence. * * * But Agnes is shipped to Parkston, and again we return to the Kaufmann home.    And now, gentlemen of the jury, they say that woman should have been down scrubbing up blood.    How do you and I know that she was not? How do you and I know that she had not been scrubbing it up and working and doing everything she could? * * * I tell you upon

my sacred honor, under the evidence of this case, that the undis-
puted evidence of the cruelty, the inhumanity shown to this girl,
has no parallel in history, sacred or profane.  She did those things.
And nobody has ever sought to disprove it and can't disprove it.
* * * I asked you if you would be bound only by the evidence that
the state offered, and you answered yea, and on that, gentlemen,
you were accepted. * * * They say that she is innocent.  She may
be a Saddist, which is a form of insanity, but not irresponsibility
under the law. * * * Erickson told you and the record shows it,
that he answered honestly and candidly every question that was
asked him on the 12th of June, 1906.  Didn't he?  Read his record.
(It was read.)  Did he refuse to answer any question?  Oh, no,
not a word.  He answered every question that was asked him,
and I asked him other questions and they object.  Why do they
object?  (The defendant excepts.)  Yes, give him an exception
to that.  Why do they object if they want the whole truth? * * *
That night, as she thought of that girl lying up there, the girl that
had roused her heart until there was no pity or passion, she grasps
something, and, stealing up the stairway, she attacks her.  Poor
Agnes lifts herself up, and the blows come upon her head and the
blood gushed.  What other testimony do you want of the act?
Who was there?  I see it.  God Almighty, in his infinite wisdom,
has given to me and you the evidence, so we see and we know.
I doubt not that which I know, under the evidence of this case.
* * * And when some man says, 'I have got a doubt,' let some
other man say to him, 'What do you base that doubt on?'  'Well,
they have not shown anybody went up to that room.'  But some
other man is going to say, 'They did show, and it was undisputed
she was in that room, and this woman was in charge of what some
have called "the palatial mansion," and under her care was the 16
year old Agnes, and the next morning she is taken away dying
with the wounds that was not there before.' * * * That is the story
that stands on this record undisputed.  It is the story of this poor
girl from Bordersdorf, Hungaria, with the beautiful sonnets on her
lips, going into the house with the doors locked. * * * Gentlemen
of the jury, he has no testimony; if he had he would have made
a case, for he hath the ability, and he comes with his great name

and great ability, and he puts himself, he said he would, upon his knees, and begs for mercy. And why? If his client be innocent he hath, under his own admission, at his hands all he needs to prove it, and has proved it not. * * * You have no right to consider how good a man he (Kaufmann) is, how many tramps he may have fed. Did he feed Agnes? That is the question. * * * That great man that sits there (Orr) has never been guilty of prosecuting anybody, and he only comes and brings his heart into this case when he knows, under the evidence that has been submitted here, that that woman is guilty. * * * Oh, all these things must be, and, gentlemen of the jury, I want you when you go there to your jury room to think this over, and then thinking it over in imagination take Elizabeth by the hand and the father by the hand and go out with me to Rose Hill Cemetery, that beautiful and silent city of the dead, and there at the tomb of Agnes, unmarked by stone or monument, write your verdict. A broken law will be vindicated, and every man's conscience will be clear."

To reproduce all the portions to which exceptions were interposed would be substantially to reproduce the entire address and to extend this opinion beyond all reasonable limits. The address abounded in misstatements as to the law and the evidence; it was replete with appeals to passion and prejudice; and it reveals an intentional disregard of the decisions of this court by repeated allusions through artful indirection to the fact that the accused had not testified in her own behalf. During the trial numerous manifestly incompetent questions were asked for the evident purpose of influencing the jury, many of which were subsequently withdrawn. Dramatic situations and scenes calculated to incite sympathy and prejudice, which should have been prevented or repudiated by the special prosecutor, if in fact he did not inspire all of them, were not wanting; such as the offering, in open court, of a prayer by the dead girl's mother for the forgiveness of those connected with the death of her daughter; the identification and exhibition of Agnes' sister Elizabeth, who was not called as a witness; and the interruptions of a woman who vehemently insisted that "beer" was the cause of the crime. Clearly, this is not the case of a thoughtful, conscientious advocate, prompted alone by a desire to have the

truth established, who inadvertently passes beyond the limits of legitimate argument in one or a few excusable instances. It is one wherein, from the beginning to the close of the trial, an egotistical, ambitious actor sought popular applause and personal renown regardless of consequences to any one except himself. Courts of justice are not constituted for such purposes. An examination of the entire record, on this appeal, irresistibly leads to one of two conclusions: either the special counsel was totally ignorant of the rules governing the conduct of a public prosecutor, or he intentionally violated such rules almost continuously during the progress of the trial. That his misconduct was prejudicial to the accused, in view of the evidence and issues involved, admits of no controversy. As said by this court in Lindsay v. Pettigrew, supra: "We recognize the rule that the conduct of the trial and the line of argument counsel are permitted to pursue rests largely in the discretion of the trial court; that the granting or refusing of a new trial for irregularities of parties or attorneys, or the misconduct of the attorney in his argument, rests largely in the discretion of such court. We further recognize the fact that this court will not reverse the decision of the court below on a motion for a new trial, where, as in this case, the facts are fully within the knowledge of the court, except in a case where this discretion is plainly misused." But this is such a case. To sustain this conviction, upon the record before us, would mean the approval of methods of procedure inevitably subversive of the most sacred constitutional rights; it would encourage—where no encouragement is needed—disregard of universally recognized professional obligations, and ultimately render the administration of justice in this jurisdiction a disgrace to American civilization.

Certain questions likely to arise upon a retrial will be briefly noticed. The court did not err in admitting testimony as to other wounds than those described in the information, as the physical condition of the deceased at the time of her death, and of her body at the time of the post mortem examination, was essential to any reliable opinion concerning the cause of death. The character of the clothing worn by the deceased when taken to the hospital was not

material, and evidence describing it should have been excluded. In its charge to the jury the learned circuit court employed the following language in connection with its definitions of reasonable doubt: "But this charity and this presumption ought not to be perverted, as they not infrequently are, to justify the acquittal of those of whose guilt no reasonable doubt exists." While, perhaps, not in itself sufficient to compel a reversal, we think this language should have been omitted as being calculated to impress an ordinary juror with the thought that the doctrine of reasonable doubt is one of questionable propriety which might better be ignored than respected, a result manifestly prejudicial to defendant.

CORSON, J. (concurring). While I concur with the views of the presiding judge in holding that the trial court did not properly exercise its discretion in denying a new trial, in view of the irregularities of the special counsel on the part of the state and in the proceedings occurring at the trial, I am inclined to the opinion that the defendant is entitled to a new trial on the ground that the special counsel in his argument to the jury called their attention to the fact that the defendant had not been called as a witness in her own behalf on several occasions during his concluding argument. It is true that counsel did not in terms state to the jury that the defendant had not been called as a witness, but he so plainly indicated to them that such was the fact that the jury could not have misunderstood that their attention was called to this fact, as we must presume that the jury was composed of intelligent persons who could readily understand the full import of the language used by the counsel when referring to the failure of the defendant's counsel to disprove the testimony offered on the part of the state, when it was in his power to have disproved it by the defendant's own testimony.

In State v. Bennett, 21 S. D. 396, 113 N. W. 78, this court very fully considered the question as to the effect of counsel calling attention, in the presence of the jury, to the fact that the defendant had not been called as a witness in his own behalf, and quoted quite fully from the opinion of Mr. Justice Field, delivering the opinion of the Supreme Court in the case of Wilson v. United States, 149 U. S. 60, 13 Sup. Ct. 765, 37 L. Ed. 650, in which that

learned court said that: "To prevent such presumption being created, comment, especially hostile comment, upon such failure must necessarily be excluded from the jury. The minds of the jurors can only remain unaffected from this circumstance by excluding all reference to it." In that case it will appear from the decision that the judgment of conviction was reversed and the case remanded with directions to award a new trial. And this court quotes with approval the following from the learned Supreme Court of Iowa: "If reference can be made to the fact that the defendant has not testified in his own behalf in arguments to the court, then such a reference may be made in every case, and thereby the statute will be nullified." Following, therefore, the decisions of this court in the case of State v. Williams, 11 S. D. 64, 75 N. W. 815; State v. Garrington, 11 S. D. 178, 76 N. W. 326; and the case of State v. Bennett, supra, the defendant is clearly entitled to a new trial for the persistent statements of the special counsel in calling the attention of the jury, indirectly it is true, but none the less effectively, to the fact that the defendant had not been called as a witness to testify in her own behalf.

The order appealed from is reversed, and a new trial ordered.