STATE, Respondent, v. LAPKE, Appellant.

(249 N. W. 634.)

(File No. 7253. Opinion filed July 18, 1933.)

*Harlan J. Bushfield, John Pusey,* and *C. M. Carroll,* all of Miller, for Appellant.

*M. Q. Sharpe,* Attorney General, and *Frank W. Mitchell* and *Ray F. Drewry,* Assistant Attorneys General, for the State.

WARREN, J. Defendant was convicted of the crime of murder, and, from the judgment and order overruling motion for new trial, he has appealed to this court.

About noon Saturday, December 14, 1929, Mrs. Mary Lapke, the deceased, and her sons, Alphonse, the defendant herein, Conrad and Harry, drove to Miller, S. D. located some twenty-three miles from the farm occupied by the Lapke family to do some marketing and transact business. They started home about 4 p. m., a neighbor and his sick boy riding with them to the said neighbor's home. They arrived home about 6 p. m. Alphonse drained the car and with the others did the evening farm chores and then went into the house. There was some talk about the business transacted in town that day between Alphonse, his mother and father. After supper, the father and the boys went into the living room while Mrs.

Lapke washed the dishes. Alphonse turned on the radio, Mr. Lapke laid down on the couch, and Harry and Conrad read the newspaper. After finishing the dishes, Mrs. Lapke came into the living room and listened to the radio for a while. About 8 o'clock she said that she must go out and shut up the chicken coop and get some meat for breakfast.

The day before, the Lapkes had done some butchering, and the carcass of a large hog hung in the granary some 190 feet east of the house.

Mrs. Lapke left the house. Some time later Harry arose and went outside to the toilet, situated some 50 feet northeast of the house. He was gone about three minutes. At this point it is well to state that the state contended that Alphonse also left the house and was gone about fifteen minutes, while all the members of the Lapke family contend that Alphonse did not leave the house that night at that time and that Harry was the only one who stepped outside of the house. It is the contention of the defense that Alphonse was at the radio when Harry left the room and was there when Harry returned. After Mrs. Lapke had been absent for about twenty minutes, the members of the family became worried and Anton, the husband, told Harry to go out and see if he could find her. Harry went out and called a "couple of times," but there was no answer. Mr. Lapke then requested all the boys to go out and see if they could find her. Alphonse, Harry, and Conrad went out; they found the west door of the granary closed, but the east door was partly open; near the butchered hog was fresh pool of blood, a butcher knife, a plate, and a flash-light, but Mrs. Lapke was nowhere to be found. They immediately reported to their father, who joined them in the search; Alphonse remained in the house and awoke and dressed the little 8 year old boy, Martin, and later joined the rest of the family in the search about the yard, a grove of trees north of the buildings, and into a field north and east of the home. Mr. Lapke then instructed Alphonse to take the car and go to Miller to see if their mother was at the daughter's place. The car was prepared; it being necessary to fill the radiator as Alphonse had drained the car when they returned from Miller that afternoon. The boys drove to Miller to the home of their sister, Mrs. William Nuhring. They did not find Mrs. Lapke. Afterwards they all returned to the Lapke home.

Alphonse and William Nuhring drove to several neighboring farms both east and west of the house in search of Mrs. Lapke, but no trace could be found. They also drove to some relatives near Orient, S. D. Later that same night, Alphonse and Nuhring came to Miller to get the sheriff. They drove first to the chief of police, informing him of the disappearance of Mrs. Lapke; the chief accompanied them to the home of the sheriff, who came out to the Lapke place. The sheriff arrived early in the morning, but dozed off to sleep waiting for daylight. The next day the search was continued by all members of the family, the sheriff and neighbors. Alphonse, Nuhring, and a Mr. Larson drove to Redfield and Zell and claim to have inquired of police and railroad stations if Mrs. Lapke had been seen or if she had bought a ticket for Wisconsin, the former home of the Lapkes. The following morning, Monday, the body was found on an old straw pile more than a mile southeast of the Lapke buildings on the Blake farm. Her throat had been cut, causing her death. The body was taken to the Lapke home, where a coroner's jury was called and an inquest held. The body was then taken to Miller, S. D.

A couple of weeks later, Anton Lapke, Alphonse, Harry, Conrad, and Martin Lapke were brought to Miller, placed in separate rooms in the courthouse, kept under guard, and were subjected to almost continual cross-examination on the part of the state and county sheriffs, deputy state sheriff, and attorneys. They were not permitted to consult an attorney nor each other. The little boy was held for one day, and the rest of the family was held nine days. No warrant for their arrest had been issued, and no complaint filed. Alphonse was arrested and charged with the crime of murder. A preliminary hearing was held and all members of the Lapke family examined.

Thereafter, upon an information duly filed, the defendant, Alphonse Lapke, was brought to trial in the circuit court of Hand county, S. D. Attorneys for the defense filed a motion to quash the information based on affidavits of attorneys and members of the Lapke family, material parts of which are hereinafter narrated. The motion to quash was denied, and the defense then demurred to the information, which was overruled. The defendant pleaded not guilty, was tried, convicted, and sentenced to the state penitentiary for the rest of his natural life. From the judgment and

order overruling the motion for a new trial, the defendant has appealed to this court.

The appellant with considerable earnestness alleges that he did not have a fair trial on account of the state's aggressive conduct in coercing witnesses to testify in its behalf, such testimony having been obtained by the state through different and diverse means, such as placing the defendant in solitary confinement, and placing many of the witnesses in separate rooms which practically amounted to solitary confinement; that the investigations made by the state were unfair and not only were questionable methods employed in coercing the defendant, but also that the witnesses gave testimony which was not true and which greatly prejudiced the defendant in the eyes of the jury. The appellant's contention can perhaps be best stated by briefly quoting extracts from the motion in arrest of judgment and affidavits produced and presented to the trial court. Paragraphs II and XIII of the motion in arrest of judgment are as follows:

"II. That the witness held by the state for the giving of testimony at such purported preliminary hearing, towit: Anton Lapke, Conrad Lapke, Harry Lapke, and Martin Lapke, brothers of the defendant, were held in solitary confinement in separate rooms upon the third floor of the court house, in the City of Miller, South Dakota, for several days prior to such alleged hearing, and were not permitted to see or talk with each other during that time, or with any other person except the State's Attorney of this county, and a special prosecutor, one Frank Mitchell, and police officers who visited such witnesses from time to time during their unlawful incarceraton, and intimidated and coerced such witnesses into giving testimony which was not true, and which was later repudiated by them after being removed from such duress; that such witnesses were not permitted to see or consult any attorney during their unlawful imprisonment, were given their meals within their rooms where they were confined; they were kept behind locked doors with guards patrolling the corridors outside, which guards were employed by the Sheriff of Hand County or by the State's attorney thereof.

"That the testimony elicited from such witnesses was the only testimony upon which this defendant could have been held for trial in this Court by a lawfully constituted, committing Magistrate; that

had such witnesses testified as they later did testify in this Court when free from intimidation and duress, the defendant herein would not, even before a lawfully qualified committing Magistrate, have been held to answer any charge. * * *"

"XIII. That after the opening of this trial and the testimony of the witnesses Conrad Lapke and Harry Lapke which had been obtained from them after unlawful imprisonment and duress, had been repudiated by them upon the opening day of this trial these particular witnesses were subjected to duress and coercion and were placed in a room on the third floor of the Court House, in the City of Miller, and held there for several hours while four police officers and three attorneys for the State sought to force them to give the testimony which such officers wanted.

"That thereafter throughout the trial such witnesses who were young and inexperienced and unfamiliar with Court Procedure were under the constant surveillance of police officers connected with the State's Attorney's office in this city, all of such treatment of these witnesses was prejudicial to the rights of the defendant and it was done within full view and with full knowledge of the jury in this case and could have no other effect than that of prejudicing the jury against the defendant."

C. M. Carroll, in an affidavit for an order requiring testimony at John Doe proceedings to be transcribed, stated in part as follows:

"He had also made an inquiry of the said Justice of Peace and of the Bailiffs who had in charge said witnesses who were then confined in rooms in the Court House and states from such inquiry that he had so made that the witnesses called to testify at that hearing were so intimidated and placed under duress to such an extent that the testimony they gave at that investigation, called a John Doe investigation and at which was present only prosecuting attorneys and State Sheriff, was not a true statement of facts concerning the question of guilt or innocence of Alphonse Lapke and states that the manner of giving their testimony at that time and the testimony they so gave affected the testimony given at a preliminary hearing on December 31, 1929, and caused them to give false testimony at the hearing and further that the duress and mistreatment of such witnesses continued until the defendant was placed on trial in March, 1930, and existed during the trial and

caused the testimony of the witnesses, especially Harry and Conrad Lapke to be untruthful and false and of injury to the Defendant."

In addition to the foregoing there are a number of other affidavits of which we take note. A. E. Conner, the justice before whom the John Doe investigation was had, narrated the facts that some of the defendant's witnesses were confined in separate rooms under guards and bailiffs, the method of examining the witnesses and cross-examining them, and it is suggested in this affidavit that the state cross-examined the witnesses and appeared to try to require the witnesses in each case to state facts suggested by the attorneys or by the state sheriff and many other matters showing the state's coercive conduct. There are the affidavits of Harry Lapke, defendant's brother, in which he relates the coercive methods and manner of the state, the affidavit of Grant Boles, a bailiff, showing that no one except the state officials was permitted to enter the rooms where the witnesses were confined, an affidavit made by Anton Lapke, the father of the defendant, one by Gunda Nuhring, a sister of the defendant, and one of Conrad Lapke, a brother of defendant, all strongly indicating that the state used every possible means to obtain testimony from the witnesses who were confined before the preliminary hearing to give testimony showing that the defendant had left the room shortly after the mother went outside. The substance of each and all of said affidavits sustains the matters set forth in the motion in arrest of judgment.

An examination of the record before us discloses the fact that the testimony procured by the state in the John Doe proceedings was not transcribed, so that the appellant's attorneys could examine it until about April 13, 1931. A record of the proceedings indicates that there was a long and detailed examination, and that some three days after the John Doe proceedings there were material changes in the testimony given at the preliminary hearing. There are also indications to the effect that the testimony given at the preliminary hearing (although the truthfulness of same was denied by the witnesses) was placed before the jury by asking said witnesses if such questions had been asked and answers made at the preliminary hearing without first inquiring and eliciting the facts by direct examination. It is contended by appellant, and there seems to be considerable support in his contentions, that the prose-

cuting officials kept the different witnesses of the Lapke family separate and apart for seven or eight days, and repeatedly asked the various witnesses concerning what had taken place at the Lapke home immediately before and after the commission of the crime; that thereafter the John Doe proceedings were had in which the prosecuting attorneys took turns at examining the witnesses in the form of cross-examination partaking in the nature of a medieval inquisition.

It is quite apparent that the statements made by certain witnesses upon the trial are quite different from what they had first made, but space forbids us to go into all of the particulars or to set forth specifically the testimony and statements made by them at various times. It, however, seems apparent to us that both Conrad and Harry believed that the defendant did not leave the room at or about the time that the mother was murdered. In a number of places in the testimony, we find inferences sustaining our views that the witnesses Conrad and Harry did not believe that the defendant left the room. Conrad testified as follows: "Did anyone go out shortly after she went out? No, we all just sat there. I was sitting on the couch."

Harry testified at the preliminary hearing:

"Did you notice anyone leave the house shortly after she did? No.

"Did you notice anyone at all leave the room? No, I did not notice.

"Isn't it a fact, did you follow Alphonse to see what he was doing? A. I did not follow him out. He did not go out."

There is also the testimony of the husband, in which he stated that no one left the room except Harry. An examination of the testimony given at the trial and particularly the continuous reading of the testimony of the witnesses Harry and Conrad Lapke given at the preliminary hearing (attorney for state saying to the court, "I suppose I will have to read all of the cross-examination") indicates that these witnesses were coerced into giving testimony and that the prosecution relied on the testimony that had been wrung from the witnesses at the John Doe proceedings as to the fact that the defendant was out of the house, and in that form it was placed before the jury by the respondent. This evidence was highly prejudicial to the defendant, and seems to be the only evidence that the

state was able to produce to point to the suspicion that the defendant had left the house. The examination of William Nuhring, the husband of Gunda Nuhring, a sister of the defendant, casts more light upon the coercive methods used by the respondent when the respondent attempted to establish the fact that Alphonse was out.

"Q. I know you don't like to tell but some of the family have told already. You were there and your wife was there so tell about what you know there. You know Alphonse had been outside after his mother left. A. No.

"Q. He followed her out in just a little while. A. The boys did not say that."

Harry again in his testimony at the trial throws additional light upon the situation while the state was placing evidence before the jury by reading questions and answers given at the preliminary hearing, when he was asked:

"Q. Isn't it a fact, didn't you follow Alphonse to see what he was doing? A. I didn't follow him out. He didn't go out."

The daughter, Gunda Nuhring, questioned by the state's attorney, an assistant attorney general and the state sheriff, was confronted by the situation that she might be placed in prison. From the record we find the following star chamber proceedings and tactics employed by the officials:

"Q. All your brothers and father say it; how does it come you didn't hear it, you were there? You knew they would be liable to blame Phonsie? You feel that way? A. No I don't.

"Q. Don't you know anything about that? A. No, I don't. I don't remember."

By the state sheriff:

"Q. You don't want to remember? A. Yes, I do. I am trying to do my best in telling.

"Q. She will have to be put in the penitentiary for perjury until she tells the truth?"

The foregoing brief extracts show plainly that there were coercive methods used. True, the officials made it appear that the witnesses were to tell the truth, yet the means and methods employed were not the best to elicit the plain truth; further, the witnesses were confined for several days and did not even have the benefit of advice of an attorney, nor were they permitted to

talk to any of their friends. Under such circumstances and tactics pursued by the officials, the witnesses were coerced into giving damaging and highly prejudicial testimony against the defendant. We further feel that this questionable method of eliciting truth, if truth they seek, cannot be sanctioned nor go unchallenged.

 Further, the sufficiency of the foundation for impeachment and the ruling thereon is entitled to criticism. It is no departure from good practice to require, in laying a foundation for impeachment, that the preliminary questioning should be such as to enable the witnesses to understand the occasion alluded to, but it is not necessary that any established formula be followed as that would be sacrificing a right to a technicality, but the elements to be placed in impeaching questions should be specific as to time, place, and circumstances so that the witness' attention may be called specifically to the matter upon which it is proposed to impeach him. The witness' attention should be called specifically to the impeaching matter, and, where the statements are in writing, it is good practice to first examine the witness by proper questioning and then calling his attention to the statements and, if in writing, such as testimony given, by showing to or by reading the matter to the witness. This method of procedure will eliminate confusion, and it seems to us that it is desirable practice to narrate to the witness the contradictory statements in the preliminary questioning, for, if his attention is not specifically called to it, it cannot be proved against him.

 We believe that the method and manner used by the state in placing before the jury testimony from the preliminary hearing was prejudicial. In many instances practically the entire examination of the witness was conducted by the method of reading from the transcript of the preliminary hearing and asking the witness if he so testified. The examination in each instance was long and protracted, and the entire testimony of these witnesses taken at the preliminary hearing was gone over in the trial of this case. We cannot refrain from again emphasizing what we said in State v. Kaufmann, 22 S. D. 433, 439, 118 N. W. 337, 343: "To sustain this conviction, upon the record before us, would mean the approval of methods of procedure inevitably subversive of the most sacred constitutional rights; it would encourage—where no encouragement is needed—disregard of universally recognized profes-

sional obligations, and ultimately render the administration of justice in this jurisdiction a disgrace to American civilization."

An examination of the entire record and a review of the conduct and the method and manner of conducting the trial by the state convinces us fully that the defendant did not have a fair and impartial trial as guaranteed by the Constitution of this state.

To reproduce all the portions of the record and testimony to which objections were interposed and exceptions taken would require the extension of this opinion beyond all reasonable limits.

We have refrained from passing upon the sufficiency of the evidence for the reason that that duty is one peculiarly within the province of the jury, and we do not wish to comment upon that phase of this appeal. We have heretofore dealt with the matters in the assignments of error which in our opinion were prejudicial to the defendant's rights to a fair and impartial trial, and feel that the defendant's rights were prejudiced to such an extent that the judgment of conviction must be reversed.

What may happen upon a new trial if the state should decide to proceed further is of considerable importance for the reason that the defendant contends that he will be able to present newly discovered evidence in support of his innocence. We are unable at this time to say that it will change the results; yet the accused is entitled to be tried upon existing evidence in an orderly way. To sustain this conviction upon the record before us would mean the approval of methods of procedure in administration of justice not contemplated by the framers of our Constitution. In addition to what we have said concerning the errors that have been specifically treated, it seems an insurmountable task, in advance of another trial, if another trial be had, to fix a rule or guide for a retrial, for the reason that the facts and record in this case may be entirely different if this matter is tried again. There ought not to be much difficulty in the trial of this case if proper precaution is observed in eliminating prejudicial testimony and the observance of proper conduct during the trial in order to mete out impartial justice. All other assignments of error have been carefully considered, and we feel it unnecessary to pass upon them, as there must in any event be a reversal.

The order and judgment appealed from are reversed.

RUDOLPH, P. J., and POLLEY and CAMPBELL, JJ., concur.

ROBERTS, J., disqualified and not sitting.